# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                     Case No.  8:11-cr-581-T-17TBM

EVER HERNANDEZ-PENALOZA

     Defendant.

_____/

## <u>REPORT and RECOMMENDATION</u>

This cause is before the court on **Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing** (Doc. 19) and the government's response in opposition (Doc. 21).  An evidentiary hearing was conducted on the motion April 25, 2012.  Thereafter the court directed counsel to submit supplemental memoranda.  These memoranda have now been submitted.  *See* (Docs. 31, 35).

The Defendant stands indicted on a single count for possession of a firearm and ammunition by an alien illegally within the United States contrary to 18 U.S.C. §§ 922(g)(5)(a), 924(a)(2) and 2.  (Doc. 10).  By his motion, the Defendant seeks to suppress all evidence, including a firearm and ammunition, seized as a result of an unlawful and warrantless search of his residence on or about September 15, 2011, in violation of his Fourth and Fourteenth Amendment rights.  Additionally, he seeks to suppress certain statements resulting from his unlawful arrest and violation of his *Miranda* rights.  In short, the government responds that deputies of the Hillsborough County Sheriff's office made a lawful

arrest of Defendant founded upon probable cause to believe he was involved in one or more home invasion robberies and that both Defendant and his girlfriend voluntarily consented to the search of their residence such that the motion to suppress the firearm and ammunition should be denied. As for statements, the government urges that such were voluntarily and spontaneously made, consistent with *Miranda*, and too are admissible.

A.

A summary of the testimony taken at the evidentiary hearing follows. Detective Robert Woods ("Woods") of the Hillsborough County Sheriff's Office testified that during the summer months of 2011 he was the lead detective on an investigation of five home invasions occurring in the Wimauma area. The home invasions appeared to be related given the nature of the activity and the modus operandi employed by the perpetrators.

On September 15, 2011, at about 3:00 a.m., a deputy stopped a suspicious vehicle in the Wimauma area. There were four individuals in the car, and ultimately guns, zip ties, and masks were located in the vehicle. Woods was summonsed and he eventually spoke with each of the individuals. One of the individuals, "Rauol," cooperated with the deputies. After day light, Rauol drove Woods around identifying for him locations where Rauol and others had committed home invasions. Rauol indicated he had participated in four such home invasions and described the events in a manner which was consistent with what the deputies knew about the home invasions from their investigation. Woods learned that these four individuals were intending to do another home invasion when they were stopped. Rauol also showed the detectives a residence at 5910 Bassa Street and indicated that "Eger" resided at that location and that Eger had been involved in two of the home invasions. Eger was

purported to have a gun and a pickup truck. During the two home invasions Eger was involved in, he purportedly stayed in the car while others entered the residences. Woods testified that the other three individuals were not as cooperative as Rauol but eventually, when confronted, they admitted involvement in the home invasions. And, at some point, all three of the other suspects acknowledged Defendant's involvement in two home invasions. Woods acknowledged that they did not know the actual identity of this person Eger, and, as it turned out, they also did not know his true name. Nonetheless, Woods believed that they had probable cause to arrest him in connection with his involvement in the home invasions.

Surveillance was set up around the area of the Bassa Street residence. Eventually, a vehicle drove up to the residence. Woods indicated that the decision was made to go to the residence to effect Eger's arrest. They did not attempt to obtain an arrest warrant or a search warrant. According to Woods, they did not need an arrest warrant because they had probable cause to arrest Eger. The residence was a trailer located on an oversized lot. The property was fenced, with a rolling gate in the front that was open when they arrived. There was a large dog chained near the gate. A team of about eight deputies, including deputies from the street narcotics unit, was employed to make the arrest. All had guns, and some wore masks. They arrived sometime before 9:00 p.m. that same day. Deputies were placed around the house and Woods and other deputies went to the front entrance. Guns were held in the low-ready position and would have been visible to the occupants once the door to the house was opened.

At the front entrance, the deputies knocked and loudly announced their presence. When a female voice from inside the trailer asked "who is it?," they again advised they were

with the Sheriff's Office and told her to open the door. The female occupant opened the door holding a small child. The detectives observed a male individual standing behind the female. The deputies told them to step outside with their hands up or visible and they did so. When the male individual reached the stairs, he was immediately handcuffed, taken to the front of the trailer, and placed in a chair. After he was secured, he was asked his name and he responded, "Ever." The female, identified as Erica Moreno ("Moreno"), was detained on the front steps where she was questioned by Woods. According to Woods, she spoke fluent English. He asked her whether there were other individuals or weapons in the house and he advised her that a security sweep would be conducted. Moreno indicated there was a gun in the bedroom. According to Woods, a team entered the residence, conducted a quick security sweep, and returned indicating there were no other individuals in the house. By his account, Moreno was somewhat upset and inquiring what was going on. Woods advised Moreno that they were present at her residence because Ever had been involved in home invasions and he advised her that Ever would be taken to the station. Moreno responded that there was no way he could be involved in such activity because he works and is otherwise always at home. According to Woods, she indicated she wanted the firearm out of the house and she consented to the officers searching the residence.[1] A written consent to search form was obtained, read to Moreno and signed by her. *See* Gov. Exh. 1. Moreno indicated the residence belonged to her father or father-in-law and that she and Ever resided there together. Regarding the consent to search form, the detective asserts that the he read the form in English and that

---

[1]The purported statements by Rauol and Moreno about Defendant having a gun in the house are not included in Woods report on these events.

Moreno agreed to sign it and did sign it without giving any indication that she did not understand English. At some point during these events, Deputy Brian Suttle ("Suttle") accompanied Moreno back into the house so she could retrieve identification. When she opened a drawer in her bedroom, Suttle observed a magazine for a firearm.

After getting Moreno's consent, Woods sought consent from the Defendant. When it became apparent that he was not fluent in English, Woods requested that a Spanish speaking deputy be summonsed to read the Defendant the form. At the time, the Defendant was still cuffed and seated in a chair in the driveway area at the front of the property. The detective described Defendant's demeanor as calm and inquisitive. He was advised briefly that they were present regarding some home invasions. Deputy Ismael Tiburcio ("Tiburcio") responded to the scene in order to read the consent form to the Defendant in Spanish. Tiburcio obtained a Spanish version of the consent form and read the form to the Defendant. Tiburcio advised Woods that Defendant indicated he understood and that he consented, and the Defendant signed the consent form. *See* Gov't. Exh. 2. According to Woods, in conversing with Defendant, he told him that all they were looking for was the firearm that Moreno had indicated was inside and they did not care about anything else. Woods testified that in response, the Defendant stated he had bought the gun a couple years earlier. Woods indicated that they wanted to recover guns in connection to the home invasions and had already recovered a number of guns that day. Defendant indicated his gun was good and that he had bought it off a guy. At this point, Defendant had not been advised of his *Miranda*

rights. Concerning the government's exhibit 2,[2] Woods admitted that the consent form listed a different address than the residence searched. He could not explain why.

According to Woods, he, Suttle, and Tiburcio then entered the residence and went to the bedroom. A loaded Glock firearm was found underneath the bed and a magazine was found in the drawer where Suttle first observed it. Photos of both the firearm and bullets from the magazine were taken. *See* Gov't. Exhs. 3 & 4. Woods testified that in another bedroom he found a vest, which was also seized. The vest was not a ballistic vest but appeared the type used for paintball activity. Although not previously described, he thought it might be related to the home invasion activity. A property receipt form was prepared and signed by Moreno for this property. Woods then gave Moreno his card and phone number and asked her to call if she had any questions.

The Defendant was then transported to the nearby district office. Once there, Tiburcio read to the Defendant his *Miranda* rights. The Defendant responded that he wished to speak to an attorney. According to Woods, they did not question the Defendant. The Defendant was advised he was being charged with home invasion robbery. Woods also told Defendant that the gun was stolen. In response, Defendant stated that the gun was not stolen and he had bought it off a guy. He also denied knowing anything about home invasions.[3]

Suttle, a deputy with the Hillsborough County Sheriff's Office, testified that he was asked to assist Woods in the arrest of Defendant. Suttle was assigned to secure the perimeter

---

[2]During the hearing, the language on this consent form was translated into English on the record.

[3]From counsel, it appears that the state ultimately declined to prosecute Defendant on any of the home invasions.

6

on the east side of the residence.  He did not observe what occurred at the front door although he heard the knock and announce.  Shortly thereafter, he approached the trailer and saw Woods with Moreno and child.  She appeared concerned and a little upset.  He stood by with her on the porch when Woods went to get Defendant's consent.  Suttle and Moreno went inside the trailer to get her identification.  In her bedroom, Moreno opened a dresser drawer and Suttle observed a magazine for a firearm.  They then returned to the living room.  When Woods returned to the trailer, they went to the bedroom and Suttle found a loaded Glock .40 caliber firearm under the bed.  He also retrieved a the magazine from the drawer and seized a casing and a .380 caliber round.  Moreno remained calm throughout the time he was conversing with her.  She appeared to understand English well.  He prepared the property receipt and had her sign it.

Deputy Tiburcio was on patrol in the area of Wimauma when asked to assist Woods on the evening of the fifteenth.  He was born in Puerto Rico and Spanish is his first language.  He has acted as interpreter and translator from time to time.  At about 9:00 p.m., he was called to Basso Street.  He spoke with Woods and was asked to read a Spanish language consent to search form (Gov't Exh 2) to Defendant, which he did.  He claimed that the address on the form was filled in by Defendant, along with the date on the bottom.  The Defendant acknowledged that he understood the form and he signed it.  He did not ask any questions after the witness explained it.

Tiburcio next drove to the district office and waited there so he could read Defendant his *Miranda* rights, which he did upon Defendant's arrival.  He denied participating in the search.

Both Moreno and the Defendant testified.  Moreno, via an interpreter, indicated that she understood only a "little" English.  Spanish is her first language.  She was born in Tampa but raised in Mexico from age five.  She did less than one year of ninth grade in the United States.  The rest of her schooling was in Mexico.  She did work at a nursing home in the United States where she had to speak English.  She was living with Ever Hernandez the night the police came to the residence.  The house on Basso Street was owned by her father but put in her and her sister's name.  By her account, the police came to the door and knocked.  When she asked who it was, they said police and told her to open the door, if not they would open it.  When she opened the door, she was holding their six month old baby and Ever was behind her.  She saw many officers, they had guns pointed at her and some wore masks covering their faces.  They were told to step out, and when they did, five or six officers entered her house.  Ever was arrested.  She was upset and crying.  She asked what was going on but they declined to tell her.  She claimed the officers who had entered the house stayed in the house for an hour.  When they were about to leave, she was asked to sign something.  She thought they were taking a wallet and cell phone.  She did not see them with a gun.  The form was in English.  She could not read it.  They never told her it was consent.  She denied knowing what she was doing.  She denied telling the officers there was a gun inside or even knowing of a gun in the house.  She denied granting them permission to enter her house.  They were in her house before she signed any form.  She was very frightened and trembling.  She indicated that she would not have signed the form has she known what it was, although she acknowledged her initials and signature on the consent form.

Defendant Ever Hernandez testified that on the fifteenth, deputies knocked strongly on the door. He can speak basic words in English and understand some English as well. In English, the officers said open the door or they would knock it down. They said they were looking for Edgar Hernandez. His wife, Moreno, opened the door. When she did so, they had guns pointed at them. The officers told them to come out. When they did, he was arrested. The officers asked if he was Edgar, which he denied. He was taken behind the trailer. He offered to get identification. They asked about a Toyota but he told them he did not have a Toyota. Woods never told him why he was under arrest. When they were going to take him away, Woods asked him to sign something, which he did. He acknowledged his signature on the consent form but denied that Tiburcio read it to him and that he (Defendant) added the wrong address or the date at the bottom. He claimed he was threatened and told he had to sign it. He denied understanding what he signed. He was not questioned by Woods about there being a gun inside, nor was he told anything about home invasions. Further, he denied giving permission to search the residence and making any statements about a gun. When shown the photos of the guns and ammunition (Gov't. Exhs 3 and 4), he denied knowledge of them. He did not put the gun under the bed or tell the officers that it was under the bed.

B.

Defendant's original motion focuses on the search and urges that the police were without probable cause to arrest the Defendant on any offense; that they had no lawful authority to order him out of the house to effect the arrest; that there was no lawful basis to conduct a search of the house; and that the purported consent was invalid because it was not the product of a knowing and voluntary waiver. Whether the consent was voluntary or not, it

followed an illegal arrest and the evidence obtained from the search should be suppressed as fruit of the poisonous tree. Thus, the firearm and ammunition and all other evidence seized as a consequence of Defendant's bad arrest and the illegal search by the officers should be suppressed.[4] By his supplemental pleading, which focuses on the statements made by him at the scene as well as at the district office, Defendant argues such statements were the product of an illegal arrest and a violation of his *Miranda* rights and should also be suppressed. Again, Defendant urges that his warrantless arrest was without probable cause and while in custody in his yard he was "interrogated" by the police without the benefit of his *Miranda* warnings, and thus statements made about the gun must be suppressed.[5] As for the statements made at the district office, although he was advised of his *Miranda* warnings upon transport to the district office, he invoked his right to counsel. And, while questioning should then have ceased, officers continued their interrogation prompting additional statements about the gun which also should be suppressed.[6]

The government argues that based on the detailed information of an admitted participant in the recent home invasions that also implicated the Defendant and identified his

---

[4]Defendant cites a number of cases which he urges support this argument. *See* (Doc. 19 at 4-7).

[5]In addition to *Miranda v. Arizona,* 384 U.S. 436 (1966), the Defendant cites the following cases in support of his argument: *Taylor v. Alabama*, 457 U.S. 687 (1982); *United States v. Brown,* 441 F.3d 1330 (11th Cir. 2006); *United States v. Patane*, 542 U.S. 630 (2004); and *Rhode Island v. Innis*, 446 U.S. 291 (1980).

[6]The Defendant again cites *Miranda* and *Innis*, as well as *Michigan v. Mosley*, 423 U.S. 96 (1975); *United States v. Gomez*, 927 F.2d 1530 (11th Cir. 1991); *Lightbourne v. Dugger*, 829 F.2d 1012 (11th Cir. 1987); and *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir. 1994).

residence, the deputies had probable cause to arrest the Defendant as he exited the residence for his involvement in at least one home invasion. Thereafter, based on Suttles's observation of the magazine in a bedroom drawer, the deputies sought consent to search from both Moreno and Defendant, which was freely and voluntarily given by both even in the face of the showing of force.[7] It argues that even if the arrest of Defendant was illegal, the fruit of the poisonous tree doctrine does not exclude evidence where the consent to search by Moreno was voluntary and not the product of an illegal seizure. Because Moreno's consent was voluntary and attenuated from the seizure of Defendant, the search was lawful.[8] It urges that the testimony of Moreno and the Defendant at the hearing was not credible and creates a bright-line for deciding the facts - if the deputies told the truth, the government wins, if not, the Defendant wins.

As for the statements by the Defendant at the scene, the government contends that such were spontaneous and admissible where the police acted on probable cause in arresting him and the statements were not the product of interrogation by the deputies. Thus, it urges there was no *Miranda* violation. As for the Defendant's statements at the district office where he was read his *Miranda* rights and he invoked his right to an attorney, the government

---

[7]It argues that even in the face of a showing of force, consent may be found. *See United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993); *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1501 (11th Cir. 1993). And, contrary to the Defendant's argument that the consent must have been knowingly given, it urges (correctly) that it need only show such consent was freely and voluntarily given. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); and *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).

[8]The government cites *United States v. Delancy*, 502 F.3d 1297, 1310-12 (11th Cir. 2007); *United States v. Santa*, 236 F.3d 662, 676-77 (11th Cir. 2000).

similarly urges that the statements made thereafter were spontaneous and not the product of interrogation.[9]

C.

Regarding the search and seizure of the firearm and ammunition, the parties frame the issues as whether there was probable cause to arrest the Defendant and whether Defendant and Moreno voluntarily consented to the search of the residence. By Defendant's argument, the deputies lacked probable cause to make the arrest and neither Defendant nor Moreno voluntarily consented to the search of the residence. In any event, consent, if given, was the direct product of the bad arrest such that the evidence seized during the search must be suppressed.

As for probable cause, case law holds that "[p]robable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime. Probable cause determinations traditionally have been guided by reviewing the totality of the circumstances." *United States v Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992) (citing *Beck v. Ohio*, 379 U.S. 89 (1964); *Illinois v. Gates*, 462 U.S. 213 (1983)). "[P]robable cause itself is a doctrine of reasonable probability and not certainty." *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995) (citations omitted).

Regarding consent searches, the starting point is recognition of the principle that warrantless searches and seizures are presumed invalid under the Fourth Amendment. "[T]he

---

[9]In support of these positions, the government also cites *Miranda; Innis*; *New York v. Harris*, 495 U.S. 14 (1990); and *Edwards v. Arizona*, 451 U.S. 477 (1981).

most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well - delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such well-established exception to the warrant requirement is a search conducted pursuant to consent. *See Bustamonte*, 412 U.S. at 222; *Garcia,* 890 F.2d at 360.

Where the prosecution seeks to rely on consent to justify a warrantless search, the burden is on the prosecutor to prove that "the consent was in fact, freely and voluntarily given." *Schneckloth ,* 412 U.S. at 222 (citations omitted). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Factors to consider include the presence of coercive police procedures, the defendant's education and intelligence, the extent of the defendant's cooperation with the officer, his awareness of his right to refuse consent, and his belief that no incriminating evidence will be found. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (citations omitted). As addressed below, for consent given after an illegal seizure to be valid, the government must establish both the voluntariness of the consent and that the consent was not the product of the illegal seizure. *Delancy*, 502 F3d at 1308.

In addition to the *Miranda* issue addressed below, there is an additional legal consideration at play in this case. "An arrest is quintessentially a seizure of the person, and therefore subject to the Fourth Amendment's reasonableness requirement." *McClish v.*

13

*Nugent*, 483 F.3d 1231, 1238 (11th Cir. 2007)(citing *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). While a warrant is not required for arrests made in a public place, an arrest in the home is subject to the warrant requirement. *Id.* at 1238 (citing *United States v. Watson*, 423 U.S. 411(1976) and *Payton v. New York*, 445 U.S. 573 (1980)). Thus, in *Payton,* the Supreme Court held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a home to make a routine felony arrest. Absent probable cause and exigent circumstances, the police must obtain a warrant before entering the suspects house to effect an arrest. *Payton*, 445 U.S. at 589-90. In this Circuit, "[t]he rule of *Payton* is that there is 'a firm line at the entrance to the house,' and absent exigent circumstances 'that threshold may not reasonably be crossed without a warrant.'" *Knight v. Jacobson*, 300 F.3d 1272, 1277 (11th Cir. 2002) (quoting *Payton*, 445 U.S. at 590). "*Payton* keeps the officer's body outside the threshold, not his voice. It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant." *Id*. However, at least four circuits have also concluded that where the police use coercive tactics to force a person out of his home to effectuate the warrantless arrest, the arrest is considered to have taken place within the home and contrary to the *Payton* and the Fourth Amendment. *See Sharrar v. Felsing*, 128 F.3d 810, 819 (3d Cir.1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007); *United States v Morgan*, 743 F.2d 1158, 1166 (6th Cir. 1984)*;United States v. Al–Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985); and *United States v Maez*, 872 F.2d 1444, 1451 (10th Cir. 1989). Thus, where the suspect is located inside his house when the officers forcibly compel him to exit the house, the arrest outside the house is considered to have occurred inside the home even

though the officers made no actual entry. To hold otherwise would allow officers to greatly extend their "reach" by using weapons and controlling suspect's movements from outside the home. *See United States v. Johnson*, 626 F.2d 753, 757 (9th Cir.1980).

## D.

Against this legal backdrop, I make the following findings from the facts adduced at the hearing.[10] Sheriff's deputies had probable cause to arrest the Defendant when they traveled to his residence on September 15, 2011, on allegations he had participated in one or more home invasions. While not overwhelming, the information provided the deputies by "Rauol," an admitted participant in the home invasions, describing how the home invasions were committed and identifying the locations where such occurred, which information, by Woods' account, was consistent with what the deputies knew from their investigation into these crimes, revealed he was a credible source of information and that his information was likely accurate. His additional information that "Eger" was involved was purportedly corroborated by the other three suspects. That information, coupled with the identification of "Eger's" residence, was sufficient to give rise to the fair probability and reasonable belief that "Eger" was a participant in the home invasions and that he would be found at the residence on Basso Street in Wimauma. The fact that the state subsequently declined to prosecute the Defendant does not dictate a different result.

The arrest of "Eger" at his house was conducted without the benefit of either an arrest warrant or a search warrant. Upon arrival at Defendant's residence, several deputies, some wearing masks and all armed with guns drawn and in the low-ready position, loudly knocked

---

[10]The government does not challenge the Defendant's "standing" on this motion.

and announced their presence at the front door and demanded the occupants open the door. When the door was opened by Moreno, Woods told the occupants to step outside with hands up or where they could be seen.[11] Moreno, with baby, and Defendant did as told and the Defendant was immediately handcuffed, taken away from the front door, searched and placed in a chair in the yard. Moreno was detained on the front porch with her baby and questioned by Woods. Woods initially inquired if there were guns or other persons inside. Moreno indicated that there was a gun in the bedroom. Deputies entered the house and conducted a quick sweep and determined no one else was inside. Moreno was advised by Woods that Ever was involved in home invasions and was going to be arrested. Woods then sought consent from both Moreno and the Defendant to search the house for guns.

The testimony of Defendant and Moreno concerning their signing the consent to search forms is simply not credible. And, apart from their forcible removal from the residence, it does not appear that the deputies used additional threats, coercion or promises to obtain consent to search such that their signing of the consent forms was not an act of free will.[12] The fact of an arrest and custody alone "has never been enough in itself to demonstrate

_____

[11]Per Woods, when the door was opened the deputies had their guns pointed forward but downward. But, they would have been visible to the occupants. Defendant and Moreno both testified that when the door was opened, the deputies had their guns aimed at them.

[12]In this regard, when it appeared Defendant was not fully understanding, Woods called a Spanish speaking deputy to assist. When that deputy arrived, Defendant was then read the Spanish language consent form in Spanish and Defendant signed off on the form. The Defendant's signature on the form was not procured by additional threats or coercion over that inherent in this arrest. There is nothing to suggest that Defendant did not have adequate intelligence to understand what he was doing. Woods had already told him that they only wanted to retrieve the gun from the house and Defendant had already claimed the gun was good or clean and had been purchased a couple of years prior. While the form did not fully advise him of his Fourth Amendment rights, he was advised of the search of the

a coerced confession or consent to search." *Watson*, 423 U.S. at 424. Here, by the deputies' accounts, there were no additional overt acts or threats employed which would indicate that either Defendant's or Moreno's will was overborne or that their capacity to make a free choice in relation to signing the consent forms was impermissibly impaired.

While I find probable cause for the arrest, I conclude that the warrantless arrest of Defendant and the detention of Moreno nonetheless violated the Fourth Amendment. Here, Woods' testimony reveals that the deputies intentionally sought to side-step *Payton* and the warrant requirement by confronting Defendant outside his home so that he could be arrested consistent with *Payton* and *Watson*. While the arrest of Defendant was made on the front doorstep of his residence and not inside, the rationale of *Payton* nonetheless dictates the same legal conclusion where, as here, the Defendant, while inside his house, was confronted by deputies, some wearing masks, all bearing guns and told to come outside with his hands up or where they could be seen. This was no mere consensual encounter with a suspect in a public place. On the contrary, this was an armed confrontation of the occupants of a residence who were ordered to exit their house at gunpoint.[13] While I can find no case in this Circuit

---

premises and the use of anything found in the search against him at trial. Thus, his signing the consent form appears an act of free will.

Moreno also gave written consent. By the deputies' more credible account, such was also an act of her free will. Here, while Moreno claimed to speak very little English and to not understand what she was signing, the deputies testimony indicates that she was able to and did converse with them in English, and that when read the written consent form, she agreed to sign it. By their account, her consent to the search was obtained after she had calmed down some and was not the result of any additional threats or coercion apart from that exhibited to get her out of the house. While she was undoubtedly frightened by these events and may well not have understood all that was occurring, her consent was not coerced.

[13]As these circumstances relate to Moreno's forcible removal from her house and her detention, the deputies' conduct is even less defensible. At the time of this confrontation, the

addressing similar circumstances, I find persuasive the decisions in the four circuits cited above.  In these circumstances, the forceable removal of Defendant from his home to effectuate an arrest outside the house violates the Fourth Amendment.  While not formally arrested, Moreno too was forcibly removed from her residence without legal justification and detained in violation of her Fourth Amendment rights.

Consent given after an illegal arrest may be tainted such that evidence seized pursuant to the consent is the "fruit of the poisonous tree."  *See Delancy*, 502 F.3d at 1308.  For consent after an illegal arrest to be valid, the government must prove both that the consent was voluntary and that the consent was not the product of the illegal seizure.  *Id.*  On this latter element, the court in *Delancy* noted three primary factors to consider: (1) the temporal proximity of the seizure and the consent; (2) the presence of intervening circumstances, and, (3) the purpose and flagrancy of the official misconduct.  *Id.* at 1309 (citing *Santa*, 236 F.3d at 677).  For the reasons which follow, I conclude that the government may not rely on consent to support this warrantless search.

As for temporal scope, while there is no bright-line rule, if the period of time between the bad arrest and the consent is extremely short, the factor weighs in favor of exclusion.  *Delancy*, 502 F.3d at 1310-11.  Time periods that have been considered extremely short are around two to three minutes.  *See Santa*, 236 F.3d at 666-68; *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003).  Here, the precise temporal scope was not clearly developed but it appears that there was a lapse of about ten to fifteen minutes between the

---

deputies had no information to suggest Moreno's involvement in any criminal activity or any other justification for ordering her out of her house and detaining her for at least an hour as they did in this case without a warrant.

deputies initial confrontation of Moreno and her consent to search and about twenty minutes between the Defendant's arrest and his consent.[14]  In *Delancy*, the court noted that the passage of ten to twenty minutes is a "relatively brief" period of time but it discounted the factor given the nature of the interaction with the police.  *Delancy*, 502 F.3d at 1310-11.  Here, the passage of time was similarly brief but the interaction with the police was more threatening than in *Delancy* given the use of guns and the fact that Defendant was handcuffed and in custody and that Moreno was similarly forcibly detained.  These circumstances militate against a finding of attenuation.

As for intervening circumstances, the consent itself can be an attenuating circumstance.  Thus, in *Delancy*, the court affirmed the lower court finding that the use of a written consent form was a significant intervening circumstance given that it fully advised the suspect of her constitutional rights and supported the conclusion that the consent was independent of the prior illegality.  *Delancy*, 502 F.3d at 1311 (stating that notification of constitutional rights was important intervening circumstance).  On the other hand, where the consent form does not thoroughly advise a suspect of his Fourth Amendment rights, it does not fully remove the taint of the unlawful police conduct and results in the second factor weighing neither for nor against suppression.  *United States v Quintana*, 594 F. Supp. 2d 1291, 1304 (M.D. Fla. 2009).  Here, the deputies used a written consent form which was less

---

[14]The time lapse between the Defendant's arrest and his signing the consent form is somewhat vague.  Based on Woods' testimony that deputies arrived at the residence about ten to fifteen minutes before Moreno signed the consent form, and given the notations on the consent forms that Moreno signed hers around 9:00 p.m. and Defendant signed his at 9:10 p.m., it appears there was about twenty minute between Defendant's arrest and his signing the consent form.

informative about Fourth Amendment rights than the one used in *Delancy* but perhaps slightly more informative than the form used in *Quintana*.[15]  In any event, the form did not fully advise Defendant (or Moreno) of their Fourth Amendment rights.  For example, the form did not clearly advise that the police were required to have a warrant before they could conduct a search or indicate the right to refuse consent in the absence of a warrant.  The lack of full notice militates against a finding of attenuation.  On the other hand, the calling in of a Spanish-speaking deputy, who was unassociated with the arrest, to read the consent form and obtain the Defendant's consent may be viewed as an intervening factor.  *Cf United States v Lopez-Garcia*, 565 F.3d 1306, 1316 (11th Cir. 2009) (determining that intervening circumstances supported argument that statements were untainted because the arrest and questioning of the defendant were conducted by different individuals).

   As for the third factor, the purpose and flagrancy of the deputies' conduct, I again find that the deputies acted purposely to side-step the warrant requirement of the Fourth Amendment.  Here, the testimony and evidence fails to reveal good cause for failing to secure either an arrest warrant or a search warrant and there is no claim of exigent circumstances

---

[15]In *Delancy*, the court noted this about the consent: "[t]he written form unambiguously informed Godfrey that she had a right to refuse to give consent, that she could demand that a warrant be obtained prior to any search, that she could consult with an attorney before consenting, that any contraband or evidence seized could be used against her in a court of law, and, finally, that she could withdraw her consent at any time."  502 F.3d at 1311.
   In *Quintana*, the consent form read, "I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that I give this consent freely and voluntarily, and that no promises, threats, force, or physical or mental coercion, of any kind whatsoever, have been used against me to get me to consent to the search described above or to sign this form."  594 F. Supp. 2d at 1304.  While the consent form was found to be a significant intervening circumstance in *Delancy*, the less informative form in *Quintana* was not.

compelling these actions. No sooner had the occupants been detained when Woods began inquiring about any firearms in the residence and seeking their consent to search the residence. Ostensibly, if all the deputies intended to do was arrest the Defendant, their mission was accomplished within minutes of there arrival. Instead, the deputies immediately inquired about guns in the residence, and when Moreno conceded there was a firearm in the house, Woods promptly sought her consent to search and then immediately turned his attention toward obtaining consent from Defendant. In my view, Woods acted purposefully to exploit the circumstances and gain entry inside this residence to conduct a search.

In sum, the short temporal proximity between Defendant's forcible removal from the residence, the failure to give full notice to the Defendant of his Fourth Amendment rights, and the purposeful and unbroken sequence of events leading to the Defendant's consent to search, all militate against a finding of attenuation.

As noted in *Delancy*, the voluntariness of the consent is only the threshold inquiry in such circumstances. "The second requirement focuses on causation: 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'" *Delancy*, 502 F.3d at 1308 (quotations omitted). I conclude Defendant's consent to the search and seizure, even if voluntary, was obtained through the exploitation of the deputies' illegal conduct and such consent may not be relied upon by the government to support this warrantless search and seizure.

In my view, the same findings are warranted in regards to Moreno. Upon these findings, her consent, even if voluntary, was the direct product of her forcible removal from

the residence and detention, neither of which action was consistent with the Fourth Amendment.[16]

In conclusion, on the matters and arguments presented to me, I conclude that the government may not rely on consent to support this warrantless search and seizure. I recommend that the motion be granted and the evidence seized be suppressed.

The post-arrest statements by Defendant raise additional issues. As noted above, the evidence reveals that upon exiting the house, Defendant was arrested, handcuffed and placed in a chair outside the residence. No effort was made to read Defendant his *Miranda* rights. Woods spoke with Moreno on the front steps and was advised no one else was inside but that there was a gun in the bedroom. After speaking with Moreno and obtaining her consent, Woods sought Defendant's consent and, while waiting for a Spanish-speaking deputy to assist him he had a conversation with Defendant. When the Defendant inquired what this was about, he was told briefly about the home invasions. Woods also told Defendant that all they were looking for was the gun that Moreno had indicated was inside and they did not care about anything else. In response, Defendant stated something to the effect that he had bought the gun two years earlier off of a guy and that the gun was good or clean. When Woods told him that they wanted to recover guns in connection to the home invasions and had already recovered a number of guns that day, Defendant repeated a similar statement about the gun.

---

[16]Although not addressed by the parties, I do question whether the Defendant may claim the benefit of Moreno's illegal detention to invalidate her otherwise voluntary consent. As a co-occupant of the residence with common authority over it, Moreno was fully capable in her own right to authorize the search. *See United States v. Matlock*, 415 U.S. 164, 169 (1974). Given that Fourth Amendment rights are personal rights, I questioned whether Defendant can claim the benefit of the violation of Moreno's rights under the fruit of the poisonous tree doctrine. Such should be addressed further before the district judge.

Subsequent to the search, Defendant was transported to the Sheriff's district office. Once there, Defendant was advised of his *Miranda* rights for the first time and he invoked his right to counsel. Thereafter, Woods told Defendant of the charges and also told him the gun was stolen. In response to that latter assertion, the Defendant again indicated that the gun was bought off a guy and was clean or good. Because these statements about the gun were the product of a bad arrest and were taken in violation of *Miranda*, Defendant seeks to have them suppressed.

Insofar as Defendant seeks to suppress the post-arrest statements, the mere fact of a *Payton* violation alone does not required that evidence or statements taken as a consequence of the arrest must be suppressed. *See New York v. Harris*, 495 U.S. 14, 21(1990). In *Harris*, the Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* Thus, even assuming a violation of *Payton*, given my conclusion regarding probable cause for the arrest, the statements taken following the arrest are not subject to the exclusionary rule merely because of the bad arrest.

As for the alleged *Miranda* violations, the matter is more problematic. Concerning the statements made at the house, the following from the Eleventh Circuit's opinion in *Lopez-Garcia* is instructive:

> In *Miranda*, the Supreme Court held that protecting a suspect's Fifth Amendment privilege against self-incrimination requires that he be warned prior to custodial interrogation that he has the right to remain silent and to have an attorney present. A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement

> of the degree associated with a formal arrest. Interrogation,
> under *Miranda* means any words or actions on the part of the
> police (other than those normally attendant to arrest and
> custody) that the police should know are reasonably likely to
> elicit an incriminating response from the suspect. The Supreme
> Court has defined an incriminating response as any response -
> whether inculpatory or exculpatory - that the prosecution may
> seek to introduce at trial.

*Lopez-Garcia*, 565 F.3d at 1316-17 (citations and quotations omitted). As for the statements

made at the house, the only issue concerns whether Defendant was interrogated in

contemplation of *Miranda* as he was clearly in custody at the time he made statements about

the gun and it is undisputed that *Miranda* warnings were not given at the scene. While the

Defendant claims he was interrogated, the government contends that the statements were

spontaneous statements admissible regardless of *Miranda*.

 While the statements at issue were not obtained by direct questioning, I cannot agree

that Defendant's statements about the gun in the house were spontaneous. Rather, the

statements were clearly prompted by and responsive to Woods' conversation with Defendant

concerning the search of the house. According to Woods, the statements followed his

statement to Defendant that they were investigating home invasions and all they were looking

for was the gun that Moreno had indicated was inside and they did not care about anything

else. While I think it is a close issue, I nonetheless conclude that the statement, made in

connection with the officer's efforts to obtain consent to search, was not the type statement

amounting to interrogation for purposes of the *Miranda* rule. That is, there was no reason for

Woods to know that his explanation of what they were looking for was reasonably likely to

elicit an incriminating response *See, e.g. Innis*, 446 U.S. at 300-01 (interrogation for purposes

of the *Miranda* extends only to an officer's words or actions that the officer should have

known was reasonably likely to elicit an incriminating response).

As for the statements made at the district office, such were made after Defendant was advised of his rights but after he invoked his right to counsel. Pursuant to *Miranda*, if a suspect indicates that he wishes to have an attorney, the interrogation must cease until an attorney is present. *Miranda*, 384 U.S. at 444. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court added a corollary to the rule by holding that when a suspect invokes his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. Here again, the government urges that Defendant's post-*Miranda* statements about the gun were spontaneous and not the product of police interrogation.

On this record, I conclude the statement about the gun was taken in violation of *Miranda.* Here, in response to the warnings, the Defendant unequivocally invoked his right to an attorney. Once again, the record reveals that the statements were not spontaneous utterances but the product of statement by Woods - here that the gun was stolen. When this accusatory statement was directed at the Defendant, Woods had already been told by Defendant that the gun was good or clean and that he had purchased it from a guy two years' earlier. In these circumstances, it is simply naive to conclude that this experienced officer did not realize that his statement challenging that assertion was not reasonably likely to elicit a an incriminating response from the Defendant. Woods had no business engaging the Defendant in any interrogation after he invoked his right to counsel. Because I find those statements made at the district office the product of a *Miranda* violation, they too should be suppressed.

25

E.

For the foregoing reasons, I recommend that the Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (Doc. 19), as supplemented (Doc. 31), be **GRANTED in part and DENIED in part** as set forth herein.

Respectfully submitted this
17th day of July 2012.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); M.D. Fla. R. 6.02.

Copies to:
Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record